# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

COLEEN G. SMITH,

        PLAINTIFF,

v.

MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,

        DEFENDANT.

CIVIL NO. 09-2996 (RHK/AJB)

**REPORT & RECOMMENDATION
ON CROSS MOTIONS
FOR SUMMARY JUDGMENT**

Edward C. Olson, 331 2nd Avenue South, Suite 420, Minneapolis, MN 55401 for Plaintiff.

B. Todd Jones, United States Attorney, Lonnie F. Bryan, Assistant United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis MN 55415, for Defendant.

## I. INTRODUCTION

Plaintiff Coleen G. Smith brings the present case, disputing Defendant Commissioner of Social Security's denial of her protective application for disability insurance benefits (DIB). This matter is before this Court, Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the United States District Court Judge on the parties' cross motions for summary judgment. *See* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.1-2.

Based on the reasons set forth herein, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment [Docket No. 13] be **DENIED** and the Commissioner's Motion for Summary Judgment [Docket No. 20] be **GRANTED**.

## II. FACTS

### a. <u>Background</u>

Plaintiff was 43 years old at the time that she filed her application for DIB on May 31, 2006. (Tr. 24, 138.) Plaintiff has completed four or more years of college. (Tr. 149.) Since 1990, Plaintiff has worked as school teacher. (Tr. 144, 170-78.) When Plaintiff began work, she worked eight-hour days, she walked five hours per day, stood seven hours per day, lifted up to 50 pounds, and frequently lifted up to 10 pounds. (Tr. 172.) Plaintiff contends that she has been unable to work since September 1, 2001, due her disabling condition. (Tr. 122.) But, Plaintiff worked in a limited capacity, part-time, after the date of onset, as a substitute teacher. She worked in this position at the time of her application for DIB. (Tr. 139-144.) In this job, Plaintiff stated that she walked one hour, stood one hour, sat two hours, and reached and wrote two hours during a four-hour workday. (Tr. 144.)

### b. <u>Relevant Medical Evidence</u>

The following section summarizes Plaintiff's medical records. This summary excludes irrelevant information.[1] Generally, unless otherwise noted, Plaintiff did not suffer from conditions or symptoms that would support a finding of a disability.

### i. <u>Plaintiff's Counseling</u>

From 1998 through September 2008, Plaintiff received counseling from a licensed psychologist, with whom she discussed her chronic physical pain issues,[2] depression issues, and

---

[1] Throughout the period in question, Plaintiff has been diagnosed and treated for other conditions, including conditions related to her gastrointestinal, respiratory, and reproductive systems. The substantial record contains diagnostic and treatment records for these conditions. Nevertheless, the recitation of the facts contained herein excludes these conditions because they do not form the basis of Plaintiff's claim for DIB.

emotional issues stemming from the abuse inflicted upon her as a child. (Tr. 298-301, 547-616, 746-824.) Plaintiff developed a therapeutic relationship with the counselor. (Tr. 512.) The counselor diagnosed Plaintiff with depression, post-traumatic stress disorder, and pain disorder. (Tr. 299.)

### ii.  Plaintiff's Medical Records Pre-2001 to 2003

Prior to 2001, Plaintiff was diagnosed with fibromyalgia, complex partial seizure disorder, gastroesophageal reflux, and hypothyroidism. (Tr. 528, 525-26.) In 1994, she had a surgery on her right shoulder to repair a rotator cuff tear; in late 1998 or early 1999, she had surgery on her right shoulder; between 1981 and 1991, she had two knee surgeries; and she underwent a carpal tunnel release. (Tr. 515, 519-20, 525, 528, 574.)

In early 2001, Plaintiff sought treatment for coccyx pain that radiated down her left leg to her knee. (Tr. 529.) Plaintiff reported that this pain was aggravated by walking, sitting on hard chairs, exercising, and bending. (Tr. 529.) Plaintiff received coccyx injections and reported that these provided some relief. (Tr. 529.) In May 2001, Plaintiff sought treatment for right shoulder pain and wrist pain, which her care providers concluded were caused by a fall. (Tr. 527-28.)  In August 2001, Plaintiff reported that her knee pain was getting worse and she reported hip and back discomfort. (Tr. 525.) Plaintiff was prescribed a Duragesic Pain Patch for her pain. (Tr. 24.)

Throughout the fall of 2001, Plaintiff experienced pain symptoms, swelling of her hands, fatigue, migraine headaches, and chronic muscle aching.  (Tr. 515-20.)  At the time Plaintiff was taking Lasix, Ultram, Neurontin, Relafen, Lidoderm, and Zomig for her pain (Tr. 511, 515); Plaintiff was taking Synthroid for her hypothyroidism (Tr. 511, 525); and Plaintiff was taking

---

[2] Plaintiff was severely abused as a child, and her medical providers often stated that her physical pain symptoms were connected to the anxiety, stress, and emotional issues connected with this abuse. (Tr. 507-12, 518, *see also* Tr. 555, 563.)

Amitriptyline and Celebrex for her depression and sleep issues. (Tr. 511, 525.) Her care providers noted that Plaintiff had limited range of motion in her shoulders. (Tr. 511.) In October 2001, Plaintiff underwent a magnetic resonance imaging (MRI) on her right knee, which "suggested [a] partial intrasubstance tear of the posterior cruciate ligament" and "[s]mall joint effusion." (Tr. 543.) In December 2001, Plaintiff received a Depo-Medrol injection into her right knee. (Tr. 509.)

In November 2001, Plaintiff sought treatment with the Mayo Clinic's Fibromyalgia Treatment Program. (Tr. 234.) Plaintiff reported that she has "fibromyalgia pain," "some known joint and muscle injuries . . . in her shoulders and knees," "some more generalized pain in her hips," and swelling and pain in her hands. (Tr. 234; *see also* Tr. 238-241.) Plaintiff also reported fatigue, poor quality sleep, headaches, migraines, blurred vision, photophobia, TMJ, lightheadedness, sense of imbalance, numbness, tingling, joint swelling, stiffness, and decreased ability to concentrate and organize thoughts. (Tr. 234; *see also* Tr. 238-241, 507-09.) Plaintiff described her "current functional status" as limited to "carrying out activities of daily living, including sporting activities, yard[]work, physical activity overall." (Tr. 234; *see also* Tr. 238-241.) In connection with this treatment, Plaintiff was diagnosed with the following relevant conditions: obesity, right knee pain, bilateral shoulder pain, and chronic pain. (Tr. 231, 237; *see also* Tr. 238-241.)

In February 2002, Plaintiff underwent arthroscopic surgery on her right knee. (Tr. 504.) While no tears were found, she was diagnosed with chondromalacia (or damage to the cartilage under her knee cap). (Tr. 504.) Throughout 2002, Plaintiff received Duragesic Patches to treat her pain. (Tr. 438, 448.) In addition to her symptoms already cited, Plaintiff began seeking treatment for chest wall pain. (Tr. 439-42.)

In approximately May 2002, Plaintiff injured her shoulders while using a "motocross bicycle." (Tr. 451.) This injury caused her shoulder pain throughout the summer. (Tr. 451, 465.) Plaintiff was prescribed physical therapy. (Tr. 451.) In July 2002, Plaintiff reported that physical therapy was not addressing the pain in her arms and shoulders, and she received a Depo-Medrol injection. (Tr. 450.) In the fall of 2002, Plaintiff received injections for her coccygeal pain. (Tr. 444, 447.)

In January 2003, Plaintiff sought treatment because of pain and headaches arising out of her fibromyalgia, chest wall pain, and carpal tunnel syndrome. (Tr. 432.) In February 2003, Plaintiff underwent a nerve conduction study of her right arm, which revealed no abnormalities. (Tr. 491.) In February 2003, Plaintiff also underwent a MRI of her cervical spine, which revealed straightening of the nerve. (Tr. 500.) As of May 2003, Plaintiff continued to have chest wall pain and joint pain, but Plaintiff reported that she was managing the symptoms. (Tr. 419.) Plaintiff was also prescribed a Duragesic Patch for her continued pain. (Tr. 402, 404, 406, 410, 415, 416, 421, 424, 427.) In May 2003, Plaintiff sought treatment for her "excessive daytime sleepiness." (Tr. 248.) Plaintiff was diagnosed with sleep apnea and obesity. (Tr. 246-47.) Her medical provider noted that depression and chronic pain may be other factors that contribute to her disturbed sleep. (Tr. 250.) In September 2003, Plaintiff was also prescribed orthotics for plantar fasciitis (Tr. 409) and Plaintiff reported the orthotics helped to alleviate her knee pain. (Tr. 409.)

### iii.  Plaintiff's Medical Records 2004 to 2006

Throughout 2004 and 2005, Plaintiff complained of arm, chest wall, and upper back pain. During this period, Plaintiff also received injections, took prescribed medications, and engaged in physical therapy to treat her bilateral shoulder discomfort. (Tr. 366, 369-70, 385, 387, 394-97, 400.) These treatments did not alleviate her symptoms, but, Plaintiff was told that there were no other options for her. (Tr. 366.)

In December 2004, Plaintiff underwent an MRI of her right knee. (Tr. 497.) The MRI revealed small joint effusion, prepatellar bursitis, and interstitial edema, but no tears. (Tr. 497.) Plaintiff received Depo-Medrol injections for right knee. (Tr. 376, 378.)

In 2005, Plaintiff received surgical treatment in relation to a medical condition distinct from her claimed disabling conditions.[3] (Tr. 226, *see generally* Tr. 217-229, *see supra* n. 1.) There was some possibility that this surgical treatment would have the positive side-effect of reducing her pain. (Tr. 318, 355, 363-64.) But, at her follow-up appointments, Plaintiff reported that she continued to have back pain, shoulder pain, a hard time breathing when lying on her back, rib pain, and swelling in her hand and arm. (Tr. 226.)

In December 2005, Plaintiff underwent an MRI of her right shoulder. (Tr. 494.) The MRI revealed a small undersurface or articular surface tear of the mid substance of the supraspinatus tendon, a partial thickness nonretracted tear, a joint hypertrophy with impingement, and a small subcutaneous nodule. (Tr. 494-95.) In January 2006, Plaintiff was diagnosed with impingement syndrome in her right shoulder with partial underlying thickness tear of the supraspinatus tendon. (Tr. 331-38.) Plaintiff received a Depo-Medrol injection in her right shoulder. (Tr. 332.)

By the spring of 2006, Plaintiff's medical diagnoses were listed as fibromyalgia/fibromyositis, impingement syndrome of her shoulder, osteoarthritis in her knee and lower leg, carpel tunnel syndrome, and somatic dysfunction of her ribcage. (Tr. 278, 287, 313; *see also* Tr. 294, 331-32.) Plaintiff rated her pain as anywhere from 5 to 10, on a maximum-of-10-points scale. (Tr. 256.) Plaintiff reported that she had discomfort "bathing, grooming, using a phone [and] working." (Tr. 256.) As a result of her reported pain, Plaintiff was prescribed

---

[3] As part of her surgical treatment, her medical providers noted that Plaintiff's past medical history included migraines, complex partial seizure disorder, osteoarthritis, fibromyalgia, depression, hypertension, chronic sinus problems, hypothyroidism, irritable bowel syndrome, joint injuries, right carpal tunnel release, right knee torn ligament surgery, and left shoulder surgery. (Tr. 226, 228, 360-61.)

a Duragesic Patch (Tr. 289, *see also* Tr. 672-76) and received physical therapy to reduce her pain in her shoulder, back, neck and ribcage. (Tr. 255-56.)

Plaintiff also received treatment from an occupational therapist (Tr. 264-73; *see also* Tr. 321-24.) A "job site" analysis was conducted as part of the evaluation by the occupational therapist, and the recommendations from the analysis were that Plaintiff's work be decreased "to 2 to 3 days per week, resting over the noon hour, [and] working half days" among other modifications. (Tr. 279.) Plaintiff reported that because she had already decreased her hours to working as a substitute, she did not feel any of the modifications could be made. (Tr. 279.) About this time, Plaintiff was also prescribed compression sleeves for her arms. (Tr. 263-64.)

In June 2006, Plaintiff consulted with a surgeon who found that Plaintiff's shoulders had "some impingement, some decreased range of motion," but he did not believe that there was as surgical option for her. (Tr. 274-75; 668-71.) The surgeon also examined Plaintiff's knee, which she injured while stepping into a boat, but her surgeon concluded that the injury was benign. (Tr. 668-71.) In June 2006, Plaintiff also sought treatment for costochondritis following a fall from a horse. (Tr. 982.)

In September 2006, Plaintiff sought treatment for shoulder pain. (Tr. 665.) Her care provider noted that Plaintiff "has been doing extremely well with just conservative treatment" but "she has been doing some increased vegetable canning from her garden and because of this she is getting some increased shoulder discomfort." (Tr. 665.) Plaintiff's medical provider diagnosed Plaintiff with De Quervian's tenosynovitis of the right wrist. (Tr. 666.) Plaintiff received a Depo-Medrol injection into her upper right shoulder and her thumb. (Tr. 666.) In October of 2006, Plaintiff also started taking Vicodin for her pain. (Tr. 675.)

In September 2006, Plaintiff also began physical therapy to address her shoulder pain; Plaintiff continued physical therapy through December 2006. (Tr. 700-16.) Her physical

therapist concluded that despite her progress she will need continued treatment to manage her symptoms. (Tr. 1119.)

iv.  <u>Plaintiff's Medical Records 2007 to Filing Date</u>

In January 2007, Plaintiff sought treatment for pain in her hands and right shoulder. (Tr. 1013.) Plaintiff reported that she had recently been sedentary in contrast to the past when she led a fairly active lifestyle. (Tr. 1013.) The exam revealed restricted range of motion in both shoulders and malrotation of her fifth finger. (TR. 1013.) Plaintiff received a Depo-Medrol injection in her shoulders. (Tr. 1010.)

In May 2007, she returned for a recheck on her shoulders and thumbs. (Tr. 1004.) Plaintiff reported continued pain in her shoulders and thumbs, but no pain in any other joints. (Tr. 1004.) Plaintiff was prescribed a Medrol dose pack. (Tr. 1004.) In August 2007, Plaintiff reported that the Medrol dose pack worked fairly well, but did not completely relieve her symptoms; therefore, Plaintiff received a Depo-Medrol injection. (Tr. 993.)

In September 2007, Plaintiff reported pain in her thumb and wrist following "a lot of canning." (Tr. 987.) Plaintiff had her thumbs x-rayed, which revealed degenerative changes in her right thumb. (Tr. 1030.) During another appointment in September 2007, Plaintiff also reported that she felt her Cymbalta was not managing her depression as it once did and that her pain was often at 9/10. (Tr. 990-91.)

In November 2007, Plaintiff obtained new compression sleeves. (Tr. 985.) In December 2007, Plaintiff reported that she had pain in both of her shoulders and her thumb. (Tr. 979.) Plaintiff underwent a MRI of her right shoulder, which revealed a partial tear of supraspinatus tendon and mild acromioclavicular joint arthropathy. (Tr. 1028.) Plaintiff received an injection of Aristospan following her MRI. (Tr. 976.) Plaintiff also sought treatment for coccydynia, which

she rated at 6 out of 10 and described as a "hot, shooting pain" that was aggravated by sleeping on her back, sitting, and cycling. (Tr. 982.) Plaintiff received a coccyx injection. (Tr. 983.)

Plaintiff received physical therapy throughout 2007. (Tr. 896-934, 935-57.) In January 2007, Plaintiff reported to her physical therapist that she noticed an increase in her upper back pain while bathing, grooming, using the phone, and working. (Tr. 956.) Plaintiff reported that the pain is constant in nature at 5 out of 10, and sometimes can be 10 out of 10. (Tr. 956.) At her February 2007 appointment, Plaintiff reported that she had been shoveling and as a result her pain increased. (Tr. 955.) At her May and July 2007 appointment, Plaintiff reported that she has been doing some extra cooking and as result her shoulder pain has increased. (Tr. 936, 934.) In August 2007, Plaintiff reported that she was quite sore after doing some canning. (Tr. 920-21, 924.) The physical therapy provided Plaintiff little relief and she reported continued pain and discomfort in her shoulders, chest, and costochondral joints. (Tr. 896-934, 951.)

Throughout 2007, Plaintiff received Duragesic and Fentanyl patches. (Tr. 990, 997, 999, 1001, 1007-09.) Plaintiff also was also prescribed Vicodin in 2007. (Tr. 1006-07,).

On December 26, 2007, Plaintiff was in a car accident, where she was rear-ended while driving. (Tr. 898.) In early January 2008, Plaintiff received treatment for bronchitis. (Tr. 1056.) At her appointment, Plaintiff noted that she had some back pain since her accident and that she has some achiness down her right leg after she walks. (Tr. 1056.) In late January 2008, Plaintiff also told her physical therapist that she has near constant headaches and increased back pain since the accident. (Tr. 872.) Plaintiff also reported to her physical therapist that she has difficulty dressing, bathing, grooming, and working. (Tr. 872.) In terms of her arms, Plaintiff described her best pain level as 8/10 (on a 0-to-10 scale), and achieves this best pain level by sitting. (Tr. 872.) In terms of her upper back and neck, Plaintiff described her worse pain level as

10/10, and it is most acute when she is bending to make her bed. (Tr. 872.) Plaintiff can achieve her best pain level of 7/10 in her back and neck by taking a warm shower. (Tr. 872.)

In February 2008, Plaintiff reported to her medical provider that she was constantly fatigued, had occasional dizziness and headaches, chronic back pain, and head and neck pain since her accident, but her depression was fairly well controlled. (Tr. 1052.) An examination revealed generally that her range of motion in her extremities was appropriate for her age, but she had limited range of motion in her shoulders and tenderness in her chest wall. (Tr. 1053.) Plaintiff had an x-ray of her surgical spine taken, which revealed "a little bit of shifting seen in the mid cervical region at about C4-C5," which "is certainly enough to cause a little bit of pain" but it was concluded that Plaintiff's pain was probably more related to myofascial and muscular discomfort. (Tr. 1026, 1045.)

In April 2008, Plaintiff sought treatment for shoulder pain, which she reported is constant and worsens with activity—especially overhead activity. (Tr. 1041.) The examination revealed symptoms consistent with bilateral impingement syndrome and either inflammation or small rotator cuff tears. (Tr. 1041.) Plaintiff received a Depo-Medrol injection. (Tr. 1041.) Plaintiff also saw the occupational therapist again, who refitted Plaintiff with new compression sleeves. (Tr. 877-79.)

In July 2008, Plaintiff sought treatment for neck and shoulder pain. (Tr. 1037.) Plaintiff noticed that she had an increase in pain in her shoulders, weakness in her arms and hands, and difficulty gripping. (Tr. 1037.) Her treating certified nurse practitioner, noted some "slight[] weakness" in her hands and arms," but her lower extremities were "fairly good." (Tr. 1037.) In August 2008, Plaintiff reported similar problems—a shooting type pain that makes her arms feel tired and neck pain. (Tr. 1034.)

In August 2008, Plaintiff also saw a rehabilitation physician. (Tr. 1031-33.) Plaintiff reported neck pain and bilateral shoulder pain, which radiated to her hands. (Tr. 1031.) Plaintiff reported the pain is at its best 5/10, and at its worst 7 to 8/10. (Tr. 1031.) Plaintiff reported that her pain level decreased when she used her compression garment, changed positions, used medication, and applied heat. (Tr. 1031.) Plaintiff reported that her pain was aggravated by coughing, sneezing, bending, twisting, strenuous exercise, and lifting. (Tr. 1031.) Plaintiff also reported that she has sleep disturbances, headaches, costochondral pain, leg swelling, and occasional tingling and numbness in her feet. (Tr. 1031.) The rehabilitation therapist found that Plaintiff was normal, except for some decreased sensation to light touch in her right digits, limited range of motion in her cervical spine and shoulders due to pain, and moderate tenderness at multiple sites. (Tr. 1032; *see also* Tr. 974.) As a result of this exam, Plaintiff's physician concluded that her pain was coming from her shoulders, and not her extremities. (Tr. 968.) In August 2008, Plaintiff also had an MRI done on her right shoulder. (Tr. 964.) The MRI showed a partial thickness rotator cuff tear, which is larger than the MRI done earlier. (Tr. 962-64; *see also* Tr. 1023.) In September 2008, Plaintiff underwent surgery to repair her rotator cuff tear. (Tr. 1068.)

Plaintiff received physical therapy throughout 2008. (Tr. 840-73, 896-97, 1056, 1037). Plaintiff reported that the physical therapy helped somewhat, but it did not eliminate the pain in her neck and upper back. (Tr. 1037.) In September 2008, her physical therapist consistently noted that Plaintiff ambulates independently without acute distress. (Tr. 842; *see also* 847.) But, earlier her physical therapist noted that she ambulates slowly. (Tr. 844.)

In October 2008, Plaintiff's treating certified-nurse practitioner summarized Plaintiff's medical conditions and treatment to date. (Tr. 1120-21.) The certified nurse practitioner noted that Plaintiff has fibromyalgia; degenerative disk disease; arthritis in her shoulders, knees, and

hips; lower back, upper back, shoulder, and chest wall pain; chronic swelling or edema in her arms as a result of her shoulder arthropathy; and carpal tunnel syndrome. (Tr. 1120.) The certified nurse practitioner noted that Plaintiff was currently using a Fentanyl patch, Celebrex, Cymbalta, Norflex, amitriptyline, and Neurontin to manage her pain and and she was also taking medication for thyroid disease, gastroesophageal reflux, migraine headaches, fluid retention, and high blood pressure. (Tr. 1120.) The certified nurse practitioner opined that Plaintiff would have difficulty living an active lifestyle and working as a teacher as a result of her physical problems. (Tr. 1121.)

### c. Evidence Arising from Plaintiff's Application for DIB

#### i. Plaintiff's Self-Description & Testimony

During the summer of 2006, Plaintiff applied for DIB and identified her conditions as including "[c]ostochondral injury, fibromyalgia, osteoarthritis, shoulder and knee problems." (Tr. 143.) Based upon these problems, Plaintiff reported that she is unable to carry items, sleep, or perform daily routines due to her level of pain. (Tr. 143; *see also* Tr. 163-166.) Specifically, Plaintiff reported as follows: Plaintiff can make some meals for herself, perform light housework, and paper work (e.g., paying bills working on health insurance paperwork) on most days. (Tr. 163, 165.) Plaintiff also takes care of her cats by feeding them and brushing them. (Tr. 164.) Plaintiff has no limitation going outside, except in the winter when weather does not permit activity, and she is capable of walking between one half to three miles. (Tr. 166, 168.) Plaintiff talks on the phone, entertains friends and visits friends, (Tr. 167.) Plaintiff limits her social activities due the fact that her pain causes her to tire. (Tr. 168.) Plaintiff has difficulties lifting, squatting, reaching, walking, kneeling, climbing stairs, completing tasks, using her memory, concentrating, and using her hands. (Tr. 168.) Plaintiff also has difficult sitting more than 15 minutes at a time. (Tr. 196.) Plaintiff cannot completely dress herself or wash her hair without

her husband's help. (Tr. 164.) This is primarily due to the fact that she has difficult performing any activity that involves her shoulders and hands. (Tr. 166, 200.) Plaintiff uses compression sleeves, shoulder braces, and glasses. (Tr. 169.) Plaintiff reported that she is only able to work part-time due to the pain. (Tr. 143.)

The hearing was held on October 21, 2008. When Plaintiff came to the hearing before the administrative law judge, she had both of her arms in her compression sleeves, her right arm was in a sling due to her recent surgery, and she had a wrist brace to support her left thumb. (Tr. 34-35.) Plaintiff testified at the hearing as follows: Plaintiff worked three and a half years as a teacher (Tr. 39); Plaintiff left teaching because she was getting the message from administrators that Plaintiff looked bad and her constant pain (Tr. 39-40); Plaintiff identified her pain as primarily in her chest, shoulders, and hands (Tr. 40); Plaintiff thought that her depression or anxiety also contributed to her pain and makes it difficult for her to manage her physical limitations sometimes (Tr. 41, 54); Plaintiff gets swelling in her legs, which is worsened by prolonged standing and alleviated by elevating her legs (Tr. 43-44); Plaintiff has pain when she sits because her tailbone has been broken four times (Tr. 45); Plaintiff typically elevates her legs twice per day (Tr. 44-45); Plaintiff's husband has been washing her hair since 1996 because she cannot raise her arms over her head (Tr. 39); Plaintiff occasionally drives, prepares meals, dusts, sets the table, cleans her toilet, removes linens from her bed, and shops (Tr. 47-48); Plaintiff does not vacuum, do dishes, do laundry, or make her bed (Tr. 48-49); Plaintiff occasionally travels by car for between 45 minutes and one hour (Tr. 49-51); Plaintiff also has flown, but it caused her great pain (Tr. 50-51, 60); Plaintiff is nervous around "grown ups" and in the past had difficulty talking to people (Tr. 56); Plaintiff has trouble with concentration and memory and she needs to make lists of things to do (Tr. 57); on Plaintiff's worse days she can walk about a block and on

her best days she walk between one and one half mile (Tr. 58); and Plaintiff's medications make her drowsy (Tr. 59) and she must take naps throughout the day. (Tr. 68.)

### ii. Psychological Medical Report

In October 2006, Plaintiff's psychologist completed a psychological medical report for Plaintiff's application and asserted as follows: Plaintiff's physical and emotional disabilities are consistent over time and significantly impact her ability to engage in enjoyable activities and succeed in employment; Plaintiff is willing to complete routine tasks, but disabilities inhibit her speed and, at times, her ability; Plaintiff's depression is perpetuated by her physical disabilities and thus, is likely to continue; and Plaintiff can carry out routine and complex instructions independently so long as her symptoms do not become too great. (Tr. 618-19; 690-92.)

### iii. Physical & Mental Residual Functional Capacity Assessment

The residual functional capacity assessment was completed in October 2006. (Tr. 621-27.) The residual functional capacity assessment found as follows: Plaintiff can lift 20 pounds occasionally and 10 pounds frequently; Plaintiff can sit or stand approximately six hours in an eight hour work day; Plaintiff's ability to push and pull is limited by her restricted range of motion in her shoulders; Plaintiff is limited in her ability to reach and handle objects; and Plaintiff must avoid moderate exposure to vibration and hazards, such as operating machinery or working at heights. (Tr. 621-27.) There was a detailed review of Plaintiff's medical records. (Tr. 628-31.) The review concluded that Plaintiff's impairment is "severe." (Tr. 628. But, the review also concluded that Plaintiff's right knee condition is a non-severe, her cervical spine condition is non-severe, and her shoulders are severe, but do not rise to the level of being a listing impairment. (Tr. 630-31.)

Plaintiff's mental residual functional capacity was assessed in November 2006. (Tr. 639-56.) The assessment found Plaintiff's ability to concentrate, perform activities punctually,

complete a normal workday and workweek without interruption, accept instructions and respond appropriately to criticism, get along with coworkers, and respond appropriately to changes in the work setting were all moderately limited. The psychiatric review of the Plaintiff concluded that Plaintiff had the medically determinable impairments of Affective Disorder and Anxiety-Related Disorder. (Tr. 639.) But the psychiatric review concluded that while these impairments were severe, they did not meet the requirements of being listing impairments. (Tr. 651.)

Plaintiff's treating certified nurse practitioner completed a residual functional capacity questionnaire in October 2008. (Tr. 1122-25.) The certified nurse practitioner concluded as follows: Plaintiff's impairments were consistent with her symptoms; Plaintiff frequently experiences pain and other symptoms severe enough to interfere with attention and concentration needed to perform simple tasks; Plaintiff is capable of performing low stress jobs; Plaintiff can sit more than two hours at one time; Plaintiff can stand for 30 minutes at one time; Plaintiff could tolerate standing for two hours and sitting for three hours in an eight hour day; Plaintiff needs to walk and switch positions throughout the day; Plaintiff can lift less than five pounds, but could occasionally look down, turn her head, look up, and hold her head in a static position; Plaintiff rarely twist or stoop and can never climb ladders or squat; Plaintiff can use her fingers 70 percent of the day, but she cannot use her hands or arms during a work day; and Plaintiff is likely to be absent from work more than four days per month. (Tr. 1125.)

iv.  Vocational Expert's Testimony

The vocational expert was Paul D. Maulucci. (Tr. 111). The ALJ presented Mr. Maulucci with multiple hypothetical questions, and Mr. Maulucci testified as follows: Plaintiff's teacher job could not be performed by a hypothetical individual who is like Plaintiff in all relevant respects and can lift 20 pounds occasionally and 10 pounds frequently; can stand and sit six hours each in an eight hour day; can walk one mile; needs to rest occasionally; can climb stairs,

stoop, kneel, and crouch occasionally; can handle bilaterally frequently; cannot reaching overhead or climb ladders; can only occasional exposure to cold, humidity, wetness, and vibrations; cannot be exposed to hazards; and can only perform routine tasks with occasional changes in routine and occasional interaction with co-workers and supervisors. (Tr. 63.) But, such an individual could be an officer helper, who takes messages, makes copies, and collates documents. (Tr. 63.) There are 3,000 officer helper jobs in the relevant economy. (Tr. 63.) Such an individual could be video monitor, of which there are 3,500 jobs in the relevant economy. (Tr. 63.) Such a person could be an information clerk or receptionist, of which there are 3,500 jobs in the relevant economy. (Tr. 63.) The exertion level on all of these positions is sedentary. (Tr. 64.)

An individual who is like the (first) hypothetical individual described above in all respects except that she can only lift 10 pounds occasionally and five pounds frequently could perform all of these jobs, but the number of available positions would be reduced. (Tr. 64.) An individual who is like the second hypothetical individual, except that she can only handle occasionally, could continue to work as an information clerk or video monitor. (Tr. 64.) Finally, an individual who is like the third hypothetical individual except that he or she must miss three or more days of work per month and is unable to sustain an eight hour workday, and must take four unscheduled rest breaks per day could not perform any jobs in the relevant economy. (Tr. 65.)

An individual who is like the first hypothetical and could not concentrate five minutes of every hour would not be able to be employed. (Tr. 66.) An individual who is like the first hypothetical and must elevate her legs three or four times throughout the day could still work as a video monitor. (Tr. 67.) An individual who is going to be absent more than three days per month would not be able to maintain competitive employment. (Tr. 67.)

### d. **Procedural History and ALJ's Decision**

Plaintiff protectively filed her application for a period of disability and DIB on May 31, 2006. (Tr. 24.) This application was denied in the first instance (Tr. 76) and on reconsideration. (Tr. 87.)   Plaintiff requested a hearing by an Administrative Law Judge (ALJ). (Tr. 90.)   A hearing was held before Administrative Law Judge George Gaffaney on October 21, 2008. (Tr. 11) There was no medical expert at the hearing. (Tr. 36-37.)   On January 16, 2009, the ALJ denied Plaintiff's application, concluding that Plaintiff is not disabled under sections 216(i) or 223(d) of the Social Security Act. (Tr. 24.) The ALJ found and concluded (1) Plaintiff has not engaged in substantial gainful activity since September 1, 2001, the alleged onset date (Tr. 13); (2) Plaintiff has obesity, fibromyalgia, post traumatic osteoarthritis, status post multiple surgeries, bilateral shoulder impingement, status post right arthroscopy in 2008, chronic pain, depression NOS, and posttraumatic stress disorder (Tr. 13); (3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 14); (4) Plaintiff has residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) (Tr. 15); Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of said symptoms are not credible (Tr. 16); Plaintiff is unable to perform any past relevant work (Tr. 23); and as a result, Plaintiff has not been under a disability from September 1, 2001 through January 16, 2009. (Tr. 24.)

On August 26, 2009, the Appeals Counsel denied Plaintiff's request for review of the ALJ's decision. (Tr. 1.)  Plaintiff filed the present Complaint on October 23, 2009. [Docket No. 1.] Plaintiff moved for summary judgment on March 18, 2010. [Docket No. 13.] Defendant moved for summary judgment on May 17, 2010. [Docket No. 20.]

### III. ANALYSIS

#### a. <u>**Standard of Review**</u>

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quotation omitted). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199.

To be entitled to DIB, a claimant must be disabled. 42 U.S.C. § 423(a)(E). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A),; *see also* 20 C.F.R. § 404.1505. The Social Security Administration adopted a five-step analysis for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4). The five steps are: (1) whether the claimant is engaged in any substantial

gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. § 404.1520(a)(5)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 404.1512(a); *see also Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

In this action, Plaintiff raises two challenges to the ALJ's application of the five-step analysis. First, Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to seek an updated medical opinion regarding whether Smith's combination of impairments were at least of equal medical significance to those of a listed impairment. Second, Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ rejected the opinion of Plaintiff's treating psychologist and treating certified nurse practitioner when determining that Plaintiff's residual functional capacity to perform work. For the reasons set forth below, this Court recommends that Plaintiff's Motion for Summary Judgment and request for remand be denied and Defendant's Motion for Summary Judgment be granted.

### a. **Is the ALJ's conclusion that Plaintiff's impairment (or impairments) did not meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 supported by substantial evidence?**

#### i. SSR 96-6p

At step three of the five-step process, "the ALJ has the responsibility to decide whether 'medical equivalence' has been established." *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010). An applicant can only be found disabled if she has a medically determinable impairment;

this "impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(a)(1). To determine whether there is a medical impairment, the ALJ must consider medical opinions (i.e., statements from acceptable medical sources regarding the nature and severity the applicant's impairments) that are part of the record. *Id.* at (a)(2)-(b). One source of medical opinions is from nonexamining state agency medical and psychological consultants. *Id.* at (f)(1)-(4). After reviewing the evidence in the record (including medical opinions), the ALJ can conclude that (1) there is sufficient and consistent evidence from which to make a determination, (2) there is sufficient and inconsistent evidence from which to make a determination, or (3) there is insufficient evidence from which to make a determination. *Id.* at (c)(1)-(4). If there is insufficient evidence, the ALJ will try to obtain additional evidence. *Id.* at (c)(3). To this end, "[ALJ's] may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 CFR § 404.1527(f)(2)(iii)

Social Security Ruling (SSR) 96-6p affirms that an ALJ is not bound by a finding by a State agency consultant or another program physician or psychologist as to whether an individual's impairment (or impairments) is equivalent in severity to any impairment in the Listing of Impairments. Social Security Ruling ("SSR") 96-6p, 61 Fed. Reg. 34, 466, 1996 WL 374180 (July 2, 1996), *available at* http://www.ssa.gov/OP_Home/ rulings/di/01/SSR96-06-di-01.html. But, SSR 96-6p also states that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] . . . must be received into the record as expert opinion evidence and given appropriate weight." *Id*. As such SSR 96-6p requires that

an [ALJ] . . . must obtain an updated medical opinion from a medical expert in the following circumstances:

• When no additional medical evidence is received, but in the opinion of the [ALJ] . . . the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

• When additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

Plaintiff contends that the ALJ's opinion on medical equivalency is not supported by substantial evidence because the ALJ failed to seek the opinion of a medical expert regarding whether Plaintiff's combination of impairments were medically equivalent to any impairment in the Listing of Impairments. For the reasons set forth below, this Court concludes that the ALJ's opinion is supported substantial evidence.

First, SSR 96-6p does not require that the ALJ *appoint* an expert on the issue of equivalency. Rather, SSR 96-6p affirms that the record must *include* opinion evidence on the issue of equivalence. "When an [ALJ] . . . finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the . . . documents signed by a State agency medical or psychological consultant." *Id.* In addition, the Eighth Circuit Court of Appeals has held that an agency consultant "necessarily gave the requisite opinion of medical equivalence . . . [implicitly]" where a residual functional capacity assessment was performed. "Because no assessment of RFC would have been necessary if the physician had found that the claimant's condition was equivalent to a listed impairment . . . ." *Carlson*, 604 F.3d at 593 (discussing *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974 (8th Cir. 2003)). The record contains medical opinion evidence in the form a Psychiatric Review Technique form, dated November 8, 2006 (Tr. 639-

52); a Mental Residual Functional Capacity Assessment, dated November 8, 2006 (Tr. 653-56); a Physical Residual Functional Capacity Assessment, dated October 26, 2006 (Tr. 620-27); and two Case Analysis forms, dated October 26, 2006. (Tr. 628-31.) Thus, the record contained the requisite expert opinion evidence.

Second, the fact that there was additional medical evidence that post-dates the agency consultants' opinions brings the present case within the purview of second condition (set forth in SSR 96-6p) and as such the ALJ was required to obtain an updated medical opinion from a medical expert "[w]hen . . . *in the opinion of the* [*ALJ, the additional medical evidence*] . . . *may change the State agency medical or psychological consultant's finding* that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id.* (emphasis added). Plaintiff incorrectly reads this Ruling to create a mandate where this Court interprets this Ruling to state the unremarkable proposition that where the ALJ believes he or she needs advice on interpreting the additional medical evidence, the ALJ must obtain an updated medical opinion. *See, e.g., Sopelle ex rel. A.N.S. v. Astrue*, Civ. No. 09-3022 (PJS/JJK), 2010 WL 5113873, 5 (D. Minn. Nov. 23, 2010) (holding that SSR 96-6p "only requires an ALJ to obtain the opinion of a medical expert when the additional medical evidence, in the opinion of the ALJ, would change a previous expert opinion that an impairment is not equivalent to a listing"). The Ruling does not require an ALJ to obtain an updated medical opinion whenever additional medical evidence post-dates the opinion of the agency consultant. Moreover, the ALJ in the present case received and evaluated the records from 2006 to 2008 and apparently concluded that the records would not alter the previous medical opinion and therefore, an updated medical opinion was unnecessary. Furthermore, this Court's review of the record does not reveal any conditions with which Plaintiff was diagnosed in 2007 or 2008, which would alter the medical opinions completed in late 2006 and early 2007.

Plaintiff argues that the ALJ should have obtained an updated medical opinion because there is no medical opinion evidence considering whether or not Plaintiff's combination of impairments are at least of equal medical significance to those of a listing impairment. (Pl.'s Mem. 11, Mar. 18, 2010; Pl.'s Reply Mem. 2-3, June 3, 2010.) But, there is no requirement that the record contain *one* medical opinion that encompasses all of the impairments. In the present case, a state agency physician and psychologist both considered whether Plaintiff's physical or mental impairments equaled a physical or mental listing respectively. Therefore, as stated earlier, the mandates of the SSR 96-6p were satisfied.

ii. <u>Listing Impairments</u>

In the present case, the ALJ considered whether Plaintiff's impairment or combination of impairments meets or medically equals listings 12.04 and 12.06. Both of these listings concern mental impairments. As this Court's review of the record demonstrates, Plaintiff also suffered from physical impairments. Plaintiff makes no argument stating which of the listing physical impairments that Plaintiff's impairments (alone or in combination) are equivalent to. Plaintiff merely asserts that the ALJ should have obtained an updated medical opinion. Defendant endeavored to surmise all of the possible listing physical impairments under which Plaintiff might have asserted an argument. Although Defendant's briefing was thorough, it was superfluous because it is Plaintiff's burden to at a minimum identify a listing physical impairment if Plaintiff was in fact asserting that the ALJ failed to consider such. This Court concludes that Plaintiff was not making such an argument because there was absolutely no briefing by Plaintiff concerning this topic. Therefore, this Court limits its review to listings 12.04 and 12.06 and concludes that the ALJ's determination as to those listings was supported by substantial evidence.

At step three in the sequential analysis, the ALJ must consider whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant bears the burden of establishing the impairment is a disabling impairment (i.e., meets or equals listed impairmen). *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990). An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A finding that an impairment equals a listing must be based on medical evidence; symptoms alone are insufficient. 20 C.F.R. § 404.1526(b); *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir.2008); *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhardt*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted).

### 1. Listing 12.04 Affective Disorder

A "disabling impairment" under listing 12.04 is an impairment that is "[c]haracterized by disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.04. The required level of severity is met, in part,[4] when the individual's affective disorder results in two of the following "Paragraph B" criteria:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or

---

[4] "The required level of severity for [affective] disorders is met when the requirements in both A and B are satisfied, or when the requirements of C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.04.

4. Repeated episodes of decompensation, each of extended duration

. . . .

*Id.* at 12.04B. The required level of severity is also met when, under "Paragraph C" the individual's

[m]edically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process . . . ; or

3. Current history of 1 or more years' in ability to function outside a highly supportive living arrangement . . . .

*Id.* at 12.04C.

The ALJ concluded that Plaintiff experiences activities of daily living are only mildly restricted because Plaintiff remains fairly active in assisting with household chores (including shopping) maintains a driver's license, and travels independently locally. (Tr. 14.) This conclusion is supported by substantial evidence. (*See, e.g.*, Tr. 47-51, 58, 163-168, 165, 665, 668-71, 872, 920-21, 924, 987.) The ALJ concluded that Plaintiff had moderate difficulty with social functioning because, although Plaintiff was abused as a child, which affects some of her adult relationships, she established good professional relationships and has no history of relationship problems when employed. This conclusion is also supported by substantial evidence in the record. (*See, e.g.*, 167, 639-56; *see generally* Tr. 298-301, 547-616, 746-824.) The ALJ concluded Plaintiff only has moderate difficulty with concentration, persistence and pace, because advocates well for herself, managed the accommodations of note writing, and acted as fairly reliable historian. (Tr. 14.) This conclusion is supported by substantial evidence. (*See, e.g.*, Tr. 57, 163-65, 639-56.) The ALJ also concluded that Plaintiff did not meet any requirements of Paragraph C and this conclusion is supported by the record in this case (as well as what is absent

from the record in this case). Because Plaintiff has satisfied two criteria, Plaintiff does not have "disabling impairment" under listing 12.04.

### 2. Listing 12.06 Anxiety Related Disorder

A "disabling impairment" under listing 12.06 is an impairment that is marked by anxiety that "is either the predominant disturbance or . . . is experienced if the individual attempts to master symptoms." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.06. The required level of severity is met when a Plaintiff has medically documented findings (including (1) generalized persistent anxiety accompanied by other symptoms, (2) a persistent irrational fear, (3) recurrent severe panic attacks, (4) recurrent obsessions or compulsions, and (5) recurrent or intrusive recollections), id. at 12.06A.1-5, and at least two of the following "Paragraph B" criteria:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration
> . . . .

Id. at 12.06B.1-4. The required level of severity is also met when the individual has medically documented findings, which result in a complete inability to function independently outside of the area of one's home. Id. at 12.06C.

There is substantial evidence in the record to support that Plaintiff can function independently outside of the area of her home, see, e.g., Tr. 47-51, and that, for the reasons set forth earlier, she does not meet at least two of the "Paragraph B" criteria. Therefore, this Court concludes that ALJ's determination that Plaintiff's impairment (or impairments) did not meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 is supported by substantial evidence and should be affirmed.

**b. Is the ALJ's conclusion that Plaintiff has residual functional capacity for light work supported by substantial evidence?**

In steps four and five, the Commissioner assesses an individual's residual functional capacity (RFC). 20 C.F.R. § 404.1520(a)(4)(iv). RFC is defined as the most a claimant can do despite the limitations of the individual's impairments. 20 C.F.R. § 404.1545(a)(1).

Plaintiff contends that the ALJ's conclusion that Plaintiff had the RFC to perform light work was not supported by substantial evidence because the ALJ improperly rejected the opinions of Plaintiff's treating psychologist and treating certified nurse practitioner. Plaintiff also argues that the ALJ's conclusion as to RFC was not supported by substantial evidence because the hypothetical question did not comprehensively describe Plaintiff's limitations.

Defendant argues that the ALJ properly discounted the psychologist opinion because the treating psychologist's opinion was based upon Plaintiff's subjective complaints and was inconsistent with the treating psychologist's earlier reports. Defendant argues that the ALJ properly discounted the treating certified nurse practitioner's opinion because a certified nurse practitioner is not an acceptable medical source and her opinion was inconsistent with the objective medical findings. Finally, Defendant contends that the hypothetical was supported by substantial evidence.

ii. Treating Psychologist's Opinion

The ALJ is required to assess the record as a whole to determine whether treating [psychologist's] opinions are inconsistent with substantial evidence on the record. A treating [psychologist's] opinion is generally given controlling weight, but is not inherently entitled to it. An ALJ may elect under certain circumstances not to give controlling weight to treating [psychologist's] opinions. A [psychologist's] statement that is not supported by diagnoses based on objective evidence will not support a finding of disability. If the [psychologist's] opinion is inconsistent with or contrary to the medical evidence as a whole,

> the ALJ can accord it less weight. It is the ALJ's duty to resolve
> conflicts in the evidence.

*Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (quotations and citations omitted). Thus, for a treating psychologist's opinion to have controlling weight, it must be based upon medically acceptable laboratory and diagnostic techniques and it must be "[]consistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

It appears that the ALJ discounted the opinion of the treating psychologist because his opinion was based upon Plaintiff's subjective assertions of pain symptoms, which the ALJ concluded were not credible, and the treating psychologist's opinion—when viewed in the context of the record as a whole—did not compel a finding that Plaintiff lacked RFC to perform light work.[5] These are valid bases for discounting a treating psychologist's opinion and are supported by substantial evidence. Rather than address these issues, Plaintiff argues that if there were inconsistencies or ambiguities in the record (i.e., if the treating psychologist's opinion was different from other medical evidence), then the ALJ was required to seek additional evidence from the treating psychologist under 20 C.F.R. § 404.1512(e)(1). But, section 404.1512(e)(1) only requires the ALJ to seek additional evidence when the evidence from the medical source is "inadequate for [the ALJ] to make determine whether [the claimant] is disabled." This is not the case here. The recorded consisted of almost nine years of documentation and a Psychological Medical Report from Plaintiff's treating psychologist as well as notations as to Plaintiff's mental stated in other medical records. Neither the treating psychologist's opinions nor the bases for the

---

[5] It is actually questionable if the ALJ accorded the treating psychologist's opinion less weight at all. The treating psychologist noted that Plaintiff engages in physical outdoor activities and teaching, is able to complete routine tasks, and can carry out routine and complex instructions. (Tr. 618-19.) The treating psychologist noted that all of these functional abilities can be limited by her chronic pain and depression. (*Id.*) The hypothetical limited Plaintiff to "simple, routine tasks in unskilled work with no more than occasional changes in routine work settings and only occasional interactions with coworkers and supervisors." (Tr. 15.) This does not appear to be inconsistent with the treating psychologist's opinion.

treating psychologist's opinion were ambiguous. Therefore, the ALJ did not err by discounting the psychologists' opinion and choosing to not seek additional information.

### iii. Treating Certified Nurse Practitioner's Opinion

The ALJ did not err by apparently discounting the opinion of Plaintiff's treating certified nurse practitioner. The opinion of Plaintiff's treating certified nurse practitioner is not an "[a]cceptable medical source" as defined by 20 C.F.R. § 404.1513(a). It appears that the ALJ only discounted the opinion of the treating certified nurse practitioner on the issue of Plaintiff's functional capacity notwithstanding her impairments and that this opinion was discounted because it was based largely upon Plaintiff's subjective assertions of pain symptoms.[6] As stated earlier, Plaintiff does not challenge the ALJ's credibility determination as to Plaintiff and this Court concludes that the ALJ did not err by not seeking clarification, especially from a non-acceptable medical source.

### iv. Hypothetical Questions

Plaintiff challenges the ALJ's hypothetical without specifying those elements of the hypothetical with which Plaintiff disagrees. Having reviewed the record and the hypothetical, this Court concludes that the hypothetical is supported by substantial evidence and relates with precision to Plaintiff's impairments. The proposition that Plaintiff could only carry 10 pounds occasionally and five pounds frequently is supported by substantial evidence. (*See, e.g.,* Tr. 621-27; *cf.* Tr. 618-19.) The proposition that Plaintiff can stand or walk six hours of an eight hour day, walking up to a mile is supported by substantial evidence. (*See, e.g.,* Tr. 621-27; Tr. 58; *see also* Tr. 166, 168, 842, 847.) The proposition that Plaintiff can sit six hours of an eight hour day is supported by substantial evidence. (*See, e.g.,* Tr. 621-27.) The proposition that Plaintiff can

---

[6] Contrary to Plaintiff's assertions, the ALJ did not outright reject the treating certified nurse practitioner's clinical findings and diagnosis, which were entirely consistent with the findings of Plaintiff's treating physicians.

occasionally climb stairs, kneel, crouch, crawl, balance, and stoop is supported by substantial evidence. (*See, e.g.,* Tr. 47-48; *cf.* Tr. Tr. 618-19; 842, 847.) The proposition that Plaintiff can occasionally be exposed to humidity, wetness and cold extremes, and vibration is supported by substantial evidence. (*See, e.g.,* Tr. 621-27; Tr. 166, 168.) The proposition that Plaintiff is limited to simple routine tasks in unskilled work with no more than occasional changes in routine work settings and only occasional interactions with coworkers and supervisors is supported by substantial evidence. (*See* Tr. 639-56; 1122-25.)

## IV.    RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment [Docket No. 13] and request for remand be **DENIED** and the Commissioner's Motion for Summary Judgment [Docket No. 20] be **GRANTED**.


Dated:        2/1/11                              s/ Arthur J. Boylan

                                             Arthur J. Boylan

                                             Chief Magistrate Judge
                                             United States District Court
                                             for the District of Minnesota


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before        February 16, 2011      .